CORONA CHEMICAL CO. v. LATIMER CHEMICAL CO.

(District Court, D. Colorado.   November 18, 1916.)

No. 6527.

PATENTS ☞328—INVENTION—IMPROVED ACID ARSENATE OF LEAD.
　　The Hall patent, No. 1,064,639, for an improved acid arsenate of lead,
better adapted, by reason of its minute and flocculent particles, to use for
mixing with water to spray as an insecticide, *held* void for lack of in-
vention, as being an improvement in degree only over prior products.

In Equity.   Suit by the Corona Chemical Company against the
Latimer Chemical Company.   On motion to dismiss bill.   Motion sus-
tained.

A. J. O'Brien, of Denver, Colo., and Dyrenforth, Lee, Chritton &
Wiles, of Chicago, Ill., for plaintiff.
W. W. Boughton, of Denver, Colo., for defendant.

LEWIS, District Judge.   This is a demurrer to a bill charging in-
fringement of rights claimed to be secured to plaintiff as assignee of
Clare H. Hall to whom letters patent were issued covering Improve-
ment in Acid Arsenate of Lead.   The letters are attached to the bill,
and I take it that, for present purposes, it is not necessary to closely
determine what is claimed in and defined by them; i. e., whether, un-
der the statute, it is an art, article of manufacture or composition of
matter.   The specifications set out a chemical process by which, in part
only, the discovery was made.   It is said in them that several steps were
taken in making the discovery and are all necessary in the production
of the improved article, the first consisting in the mixing or union of
well-known chemicals, the resultant product being stated, which is
then mechanically subjected to four separate physical treatments be-
fore the composition reaches its final stage of commercial usefulness.
That is, the chemical resultant is pressed, dried, broken into conven-
ient pieces and then pulverized in a pulverizer of the disintegrator
type.   This gives basis for a contention that the patent covers a pro-
cess within the meaning of the statute as an art, while on the other
hand the claims call for an article of manufacture or combination of
matter.   But regardless of that, the specifications present, in the light
of common knowledge, the facts on which the sufficiency of the de-
murrer is rested.   They set forth:

"My invention consists in a novel material which is chemically acid arsen-
ate of lead ($PbHAsO_4$) having certain novel and valuable physical properties
particularly suiting it for use as an insecticide.
"Acid arsenate of lead, when used as an insecticide, is mixed with a rela-
tively large quantity of water, usually 1 part of the acid arsenate to 400
parts of water by weight, and the physical mixture thus formed is sprayed upon
the plants to be treated.   Since the acid arsenate of lead is practically in-
soluble, the resultant mass is simply a physical mixture, and it is of the
utmost importance when using it that the acid arsenate of lead be of such
physical consistency as to remain suspended in the liquid, without substantial
settling, during the period which will be occupied by the spraying.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"The acid arsenate of lead has heretofore been made by precipitating from one or another of the various combinations of salts which will produce it, and the resultant mass has been treated in a filter press to form a pulp. In most cases, this pulp is ·the commercial product, the pressure being such as to leave about 50 per cent. of water by weight in the mass. In some cases, this pulp has been dried and pulverized, the dry acid arsenate of lead being sold in the form of powder. In use, both products have been added to and stirred in the requisite amount of water.

"It has been found that the drying and pulverizing of the pulp, in practically every case, greatly increases its settling tendency, and, for that reason, prior to my invention, the. pulp has been in greatest demand. The pulp, however, has certain important disadvantages. In the first place, the expense of packing and shipping, as compared with packing and shipping the dry product, is considerable. In the second place, the pulp in the hands of the consumer or middleman frequently dries out into a cake which cannot be mixed with water and which is therefore useless. In the third place, there are very stringent Federal requirements as to the percentage of water permitted in the pulp, and from the manufacturing point of view it is an exceedingly difficult matter to maintain the percentage constant, so that one part of a given batch may have 55 per cent. water, while another has 45 per cent., with the result that the manufacturer may unwittingly subject himself to criminal prosecution. In spite of these disadvantages, however, the superior suspension properties of the pulp have led to its being the most popular form of acid arsenate of lead. I have succeeded, however, in producing a dry arsenate of lead of the .composition PbHAsO$_4$ which remains in suspension in water as well as any of the pulps heretofore manufactured and far better than any of the dry material of similar chemical composition. The difference in this property is of course caused by a difference in physical constitution, and the material is obtained by employing several steps which. co-operate to this end.

"As a first step, it is desirable that the material be thrown down in the form of the most minute possible particles, and this result can be produced by using extremely dilute solutions of the reacting salts; as, for instance, sodium acid arsenate, NA$_2$HAsO$_4$, and lead nitrate, Pb (NO$_3$)$_2$, the nitrate of lead being formed in a solution of 1 part of nitrate of lead to 150 parts of water, and the sodium acid arsenate being introduced in a relatively strong solution, say 1 part to 10 parts of water and at slow speed. The precipitate thus formed is so fine and flocculent as to make it a matter of some difficulty to press it to the dryness at which commercial pulps are regularly sold. This fine precipitate is pressed in the filter press to what is known as a 35-37 per cent. pulp, that is, a pulp in which the solid matter is by weight approximately 65 per cent. of the cake. The cake is ejected from the filter press, dried, and pulverized in a pulverizer of the disintegrator type, after it has been broken up into pieces of a convenient size—say pieces which will pass an inch mesh. The resultant material is a fine, exceedingly light powder. While the dry bulk of the material, uncompressed, has little relation with the important quality of the length of time it will remain suspended in water, it may be stated as a fact, for purposes of identification, that the present product has, in fact, a rather high dry bulk, about 100 cubic inches or more to the pound, and this is a considerably larger dry bulk than that of the other dried products now available. It will be understood, of course, that this dry material can be compressed somewhat in packing, and the foregoing figure has reference merely to its unpressed condition as it emerges from the pulverizer in marketable condition.

"The most distinctive and important quality of the present material lies in its capacity for remaining suspended in water in which it far excels all other dry materials now available. Since there is no recognized standard for determining or measuring this quality, I have devised a test to which I have submitted the various forms of acid arsenate of lead available, which test is performed in the following manner: In this test 15 grams of the arsenate of lead is pulped with water and diluted until the total volume is 250 c. c., the mixture being performed in a cylindrical glass graduate of this capacity and

with a diameter of approximately 1½ inches. As the temperature of the water has a decided influence on the settlement, a temperature of very close to 15° C. has been used. The density of warm water being much less than cold, the settlement is noticeably faster at temperatures above 15° C. and noticeably slower at temperatures below 15° C. The acid arsenate of lead of course begins to settle, and after a short time a distinct space of clear water can be seen above, the lower part of the graduate remaining full of the white opaque mixture. In making the test which I have devised, the location of the line of separation between the clear water and the mixture is observed at intervals, and I have learned that my product settles in the following manner: At the end of five minutes, the line of separation is at 210 c. c. mark, at the end of 10 minutes, at 175 c. c., at the end of 1 hour, 92 c. c., at the end of 24 hours, 68 c. c., this last figure representing practically final settlement. I have tested samples of the materials on the market in dry form (with the exception of one or two of which I was unable to obtain samples), and I have also tested the various commercial pulps by first drying and then pulverizing the same, and I have also made similar tests on the pulps in their commercial condition. The foregoing rate of settlement is as slow as that of any of the pulps, and it far exceeds that of any of the dry materials available. For practical purposes, manifestly the rate of settlement during the first 10 minutes is the important point, and although the rates of settlement of the different materials in the main correspond, I have discovered some instances where materials settle relatively slowly during the first 10 minutes and relatively fast thereafter. However, my material not only settles slower, but settles much slower during the first 10 minutes than any of the dry products available. In fact, the slowest settlement which I discovered with a dry product was 165 at the end of 5 minutes, and 105 at the end of 10 minutes, and the largest final settlement which I observed was 45 at the end of 24 hours, as against 68 for my product.

"It is thus evident that my product, while chemically the same as other materials sold for the purpose, has radical differences in its physical form, which differences are readily distinguishable by the simple settling test above outlined. It is also a fact that this physical test is directed immediately at the single quality of greatest utility in practice."

The claims are as follows:

"1. The herein-described dry,' soft, white bulky powder essentially acid arsenate of lead (PbHAsO₄) distinguished by the fact that when mixed with water in the percentage of 15 grams to a total volume of 250 c. c., and allowed to settle the line of demarcation between the clear and clouded parts of the fluid is not below 175 c. c., at the end of 5 minutes, and not below 140 c. c., at the end of 10 minutes.

"2. The herein-described dry, soft, white bulky powder essentially acid arsenate of lead (PbHAsO₄) distinguished by the fact that when mixed with water in the percentage of 15 grams to a total volume of 250 c. c., the line of demarcation between the clear and clouded parts of the fluid is approximately at 210 c. c. at the end of 5 minutes and approximately at 175 c. c. at the end of 10 minutes."

The evident and conceded purpose, in its use as an insecticide, is to deposit on and thoroughly cover the infected surface with the poisonous material by ejecting it in a spray; and to thoroughly accomplish that end it is desirable that the poisonous particles be minute. The whole claim of the patentee is that he made the particles minute and flocculent. It is admitted that "my product" is chemically the same as other materials sold for the purpose, but that it has "radical differences in its physical form," and that "it is desirable that the material be thrown down in the form of the most minute possible particles, and this result can be produced by using extremely dilute

solutions of the reacting salts." The precipitate thus formed is fine and flocculent. That difference is said to be demonstrated by the fact that it remains in suspension longer when in water than any other dry acid arsenate of lead then on the market, and as long as the same chemical in pulp form then sold on the market as an insecticide. The same claimed super-quality of suspensibility would undoubtedly be manifested if the powder was cast on the breeze, which is but proof of its relative fineness. So that the improvement which the patent purports to cover is greater fineness and flocculence of particles and not suspensibility attributable to the law of gravity.

Concededly, for present purposes, the patentee's process was new, and the resultant composition was new in commerce; but if only new in the same sense that ground coffee and comminuted glue were new when they were first introduced, it was not new within the sense of the statute as construed; nor in the latter sense would the way in which it is to be made necessarily be new. The patented compound is claimed to have been discovered by combining the solutions of two other chemical compounds, sodium acid arsenate and lead nitrate, both old, well known and widely used.

Starting with the foregoing as resting in common knowledge, we reach the technical field in which the patentee claims he made his exploration and discovery; and we thus credit him with discovering the percentage of water required in each constituent solution and the slow speed of their mixture as the prerequisites to throwing down the resultant in the most minute and flocculent particles. This clearly appears to be all that he did by way of inventing the chemical process which produced his new combination of matter. He claims no more and proof would not go further. With that result in hand, all else in way of treatment is purely mechanical and readily suggestive to any one familiar with the subject.

The chemical process which the patentee thus described, and also its resultant product, each impresses me as but an advancement in degree. He claimed an improvement in acid arsenate of lead. That chemical compound in both the pulp and dry form was well known and widely in use, as he sets forth, for all purposes that were claimed for the patented combination. Admittedly, that in the pulp form could be used as efficaciously as complainant's as an insecticide, and that in the dry form was on the market and was also being used for that purpose. It was inferior in degree only to complainant's. The patentee took a step forward. As he says, it was only an improvement; and that only in degree. It seems the step was simple, an experiment that would occur to any one familiar with the art, when we consider the vast number of combined drugs and chemicals applied to useful and beneficial purposes. To monopolize each under the protection of the patent law would go far to thwart progress. The field of advancement not covered by the statute is larger than the one within its terms. It required only common sense to know that the smaller the poisonous particles were the longer they would remain in suspension for use in the spray, and would more completely cover the infected surface. And this was only raising efficiency in degree without the accomplishment

of any new function. A chemical laboratory is on the same footing under the statute as any other work shop. Every-day knowledge of the chemist and not inventive genius prompted the successful experiment. In this respect the same rule which applies to patented machines applies to patented arts and products. Tire Co. v. Lozier (C. C.) 84 Fed. 659, 668.

On the following cases I am led to the conclusion that the patent is void and that the motion to dismiss is well taken: Glue Co. v. Upton, 97 U. S. 3, 24 L. Ed. 985; s. c., Fed. Cas. No. 9,607; Smith v. Nichols, 21 Wall. 112, 119, 22 L. Ed. 566; Atlantic Works v. Brady, 107 U. S. 192, 199–200, 2 Sup. Ct. 225, 27 L. Ed. 438; Risdon, etc., v. Medart, 158 U. S. 68, 81, 15 Sup. Ct. 745, 39 L. Ed. 899.

The motion is sustained and the bill dismissed.