KESTER SOLDER CO. v. SILVA WARES CO., Inc., et al.

District Court, S. D. New York.

Aug. 13, 1931.

Duell, Dunn & Anderson, of New York City (Alex C. Mabee, Benjamin H. Sherman, and Charles W. Hills, Jr., all of Chicago, Ill., and Joe E. Daniels, of New York City, of counsel), for plaintiff.

John W. Remer, of New York City (Charles R. Fenwick, of Washington, D. C., Joseph Dugan, of Washington, D. C., and John W. Remer, of New York City, of counsel), for defendants.

PATTERSON, District Judge.

The suit charges infringement of Ripley patent, No. 1,724,680, relating to rosin core solder. The patent was applied for on February 4, 1927, and was issued on August 13, 1929. The plaintiff now owns it.

The patent recites that solder tubes with flux cores have been used for a long time. When heat is applied to the solder, the flux melts with it and promotes the fusing of the metals. Although other kinds of flux are sometimes used, the usual flux is rosin. Ripley goes on to say that it is characteristic for the rosin core to become powdered in the course of its contraction after introduction in a molten condition into the tube and also in the course of reeling and spooling the wire. The fractures are due to the brittleness of the

rosin. Rosin in a pulverized condition deteriorates and loses part of its fluxing efficiency.

The object of Ripley's invention was to provide a rosin core solder whose core would not deteriorate. This is achieved, says Ripley, by mixing a solvent (preferably turpentine) with the rosin so as to render the latter plastic, as distinguished from the dry powdered form of the ordinary rosin core solder. In this condition there will be no fractures of the rosin and it will keep its fluxing quality indefinitely. From 2 per cent. to 50 per cent. of turpentine is recommended, depending upon the grade of rosin to be treated. So Ripley claims as his invention a self-fluxing solder tube or wire, with a continuous plastic core comprising rosin as the principal active fluxing agent and a solvent to render the rosin permanently plastic.

The defenses pressed at the trial were the usual ones, invalidity of the patent and non-infringement. Infringement was so clearly proved that no detailed discussion of the evidence on this branch of the case is required. It is enough to say that the rosin core solder of both corporate defendants had a plastic core, the plasticity resulting from the addition of rosin oil to the rosin. The contention that the rosin oil was added merely to overcome alleged difficulties in manufacture and not to furnish plasticity is rejected as both improbable and irrelevant.

In pressing the defense of invalidity, the defendants urge among other things that the patentee purported to solve a problem that was only imaginary; that pure rosin in rosin core solder will not deteriorate; that in fact it is better than rosin plus a solvent such as turpentine. Upon this feature of the case, the demonstrations conducted in court by the plaintiff's witnesses Ripley and Herstein, plus the testimony of Herstein as to the decomposition of pure rosin in a pulverized state, were sufficiently convincing to induce the belief that when pure rosin is used in the core it pulverizes and tends to deteriorate, near the end of the tube if not throughout the tube. I certainly cannot say that the invention has no utility or that Ripley merely set up a straw man and then knocked it down. Point is also made by the defendants that the solvent particularly recommended in the patent is turpentine, that rosin is merely a product obtained by distillation of turpentine oil from crude turpentine, and that the patentee is therefore merely restoring to the rosin a product previously taken out of it. What bearing this has upon the validity of the patent I cannot see, even if it be assumed that the only solvent suggested in the patent was turpentine, which of course is not the fact.

The real question in the case is whether the Ripley patent is invalid for want of invention and novelty. The prior patents relied upon by the defendants are those to Lamb, 153,090, in 1874; Kester, 695,444, in 1899; Sinclair & Johnstone (British), 16,869, in 1887; Bertou (French), 370,870, in 1906; and Widmaier (German), 365,123, in 1922. The Lamb patent has nothing to do with flux core solder. It teaches that if flux is kept in liquid form, in bottles (as by dissolving rosin in a liquid which will evaporate when used), the flux will be better than powdered rosin which is said to deteriorate, to be blown away by the wind, and to be objectionable in many ways. The Kester patent shows that solder wire with a fluxing agent in the core was in common use. His invention was to pinch the tube at intervals so as to form cells or compartments containing the flux, thus preventing, as he says, the escape of too much flux when the wire was fused. It is true that Kester speaks of the flux as being "either dry or pulverized or in the form of a paste." What the paste was, whether metallic or not, is not revealed. Kester also describes the process of manufacturing his improved tube, stating that the tube is first filled with flux "in dry, plastic, or liquid form" and then is pressed at short intervals to form the cells. The reference to the form of the flux, however, is clearly to its condition at the time of insertion into the tube and not to its condition thereafter. There is nothing to indicate that Kester had in mind rosin core solder with a permanently plastic rosin core. The Sinclair & Johnstone British patent covers a solder tube with a rosin core, the rosin being pressed or poured in while in a melted state —in other words, the common kind of rosin core solder. The French patent to Bertou comes closer. It recommends a solder tube with a paste core, the paste being a metallic powder diluted in a cleaning agent such as zinc chloride and "mixed or not" with rosin. The Widmaier patent deals with an entirely different matter and has no place in the picture.

The state of the art prior to Ripley, as shown by these patents, seems therefore to have been that ordinary rosin core solder was in common use, as Ripley himself concedes; that solder wire with a core of metallic paste was known (Bertou); and that rosin dissolved in a liquid (kept separately in a bottle and not in the solder tube) and used in solder-

482

ing work was practiced (Lamb). It seems to me that Ripley's idea of a rosin core solder wherein the rosin would be kept permanently plastic represented an advance over such prior art and involved invention on his part. For better or worse, it was a product distinctly different from those already in use.

It is argued that Ripley merely aggregated articles well known before and that the aggregation had no new function. I think that this is an unfair disparagement of his work. I cannot find that plastic rosin had ever been used in soldering, even separately from the solder. Lamb's idea was to mix rosin with a solvent, turpentine included of course; but the product conceived of by him was distinctly a fluid unsuitable for use as a core in solder wire. Ripley's idea, on the other hand, was a plastic solid. The defendant's argument would have more force if it could be shown that the use of plastic rosin in soldering, the rosin being kept separate from the solder, had been taught prior to Ripley. There is no such showing. Moreover, I believe that in Ripley's product there is co-operation between the rosin in plastic form and the solder tube. The combination has all the conveniences of ordinary rosin core solder, and it has also the advantage of nondeterioration of the rosin. The latter is the result of the rosin being kept plastic and also protected from the atmosphere by the solder wall. It seems to me therefore that the cases cited by the defendants, Milligan & Higgins Glue Co. v. Upton, 97 U. S. 3, 24 S. Ct. 985; Corona Chemical Co. v. Latimer Chemical Co. (D. C.) 240 F. 423, and the like, are distinguishable. Nor can I agree that the case is governed by Carbice Corporation v. American Patents Development Co., 283 U. S. 420, 51 S. Ct. 496, 75 L. Ed. 1153, where the patent was held void for lack of invention.

The defendants also contend that Ripley's patent was anticipated by prior public use and sale. The only testimony in support of this contention was McBride. His testimony was unsatisfactory in several respects, and the proof of prior use rested upon his uncorroborated oral statements. Under the rule requiring clear and satisfactory evidence of prior use, it is manifest that prior use by McBride was not established. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Barbed Wire Patent Case, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154.

Since I have concluded that the Ripley patent is valid and that it has been infringed by the two corporate defendants, there will be a decree against them. The only proof of infringement by Gottlieb and Berry is as officers or agents of the corporations; the evidence is insufficient to show a conspiracy by them to infringe under cover of the corporations. The bill will therefore be dismissed as against them individually. The plaintiff will submit new findings and conclusions, to be in accordance with this opinion.