**KESTER SOLDER CO. v. BERRY SOLDER CO., Inc., et al.**

District Court, S. D. New York.

April 27, 1936.

SYMES, District Judge.

In this suit the Kester Solder Company charges the defendants with infringement of the Perry C. Ripley patent, No. 1724680, filed February 4, 1927, and granted August 13, 1929, relating to improvements in rosin core solder. It further alleges that the defendant Arthur S. Berry was a defendant in a prior suit brought by the plaintiff against Silva Wares Company, Inc., and others in this District, in which the said Ripley patent, No. 1724680 was by a decree entered therein October 30, 1931, adjudicated valid and infringed by other corporate defendants named in said suit. Kester Solder Co. v. Silva Wares Co., 53 F.(2d) 480, 482.

The joint answer of the three defendants denies the alleged infringement, denies the validity of the patent, and asserts that every substantial and material part thereof had been patented or described in printed publications prior to Ripley's alleged discovery and more than two years prior to his application. It sets up a long list of prior patented art and publications, the number of which was before trial reduced by stipulation to nine, on which the defendants relied at the trial.

Solder tubes or soldering wire are comparatively small hollow flexible wires of soldering material filled with a suitable flux core; hence when heat is applied to the solder strand the melting of the solder liberates the contained flux in proper proportions upon the surfaces that the solder is to adhere to. To insure a perfect union between the surfaces that are to be joined together they must be first cleaned of rust or other foreign material. For this purpose, various types of fluxes are employed, of which rosin is the most satisfactory. It has been found more convenient to inclose the flux as a core in predetermined proportions in the soldering wire in the manner described in this patent.

The patent admits that self-fluxing solders are old and specifically that the well-known rosin-cored solders, in which the rosin is introduced into tubular solder in a pure and unmixed state, are also old in the art.

The improvement Ripley claims for his patent is: Soldering wire with a rosin flux core in permanent plastic form, as distinguished from the dry-powdered-like form of the ordinary rosin-cored solder. Prior to Ripley, it seems in order to facili-

tate its introduction within the restraining wall of the solder tube, the rosin was first converted from a solid state to that of molten fluidity by the application of heat. Ripley contends that after its introduction within the solder tube it cooled, became a solid and fractured, due to contraction; that in the subsequent operations necessary to prepare the solder wire for market, such as reeling, spooling, etc., the column of rosin, being brittle, pulverized; that the contraction creates a vacuum in the tube, draws air and moisture into the pulverized rosin column, causing decomposition, which it is alleged defeats the object of a cored solder.

Ripley's objective is a rosin core that will not deteriorate over a relatively long period of time. He claims this is accomplished by the use of a rosin core, substantially plastic; that a plastic core will resist the expansion and contraction, will yield to stresses such as the bending, flattening, etc., of the solder tube, and at the same time maintain its homogeneous character; that by fully filling the core and sealing the ends, the penetration of air and other destructive elements is prevented.

He names several agents as suitable plasticisers or solvents, of which turpentine is the most practical, being relatively less volatile at soldering temperatures and a nonconductor of electricity. The amount to be employed varies, according to the patent, within a 2 per cent. to 50 per cent. range of turpentine by weight, depending somewhat upon the grade of rosin used. The walls of the solder tube prevent the solvent from evaporating, so the plasticity of the core is substantially permanent, regardless of changes of temperature.

The crux of the six claims is: A substantially permanently plastic core of rosin, completely filling the hollow solder wire, sealing the interior thereof against the ingress of air and moisture.

In the prior suit referred to, the court held that "Ripley's idea of a rosin core solder wherein the rosin would be kept permanently plastic represented an advance over such prior art and involved invention on his part."

This was based upon a finding by the court that plastic rosin had never been used before in soldering, even separately from the solder, although the court observed that Lamb No. 153090, as far back as 1874, mixed rosin with a solvent such as turpentine, using enough to make the product a fluid, which, of course, is unsuitable for use as a core in solder wire. Also that the French patent to Bertou recommends a metallic paste core. The court also stated that the testimony offered in support of anticipation by prior use was unsatisfactory, consisting solely of uncorroborated oral statements, and therefore did not meet the requirement of "clear and satisfactory evidence of prior use." Citing Eibel Process Co. v. Minnesota, etc., Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; The Barbed Wire Patent Case, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154.

It is stipulated in the case at bar that the prior art patents and publications cited in the other suit were those cited in the patent office against Ripley, and that none of those here pleaded and relied on were called to the attention of the patent office against Ripley or used by the defendants in the prior suit.

Furthermore, the plaintiff seems to acquiesce in the statement that in the former suit there was no showing made that plasticised rosin as such was known or used, Ripley admitting that in the former suit he testified that as far as he knew it was not known to the art that rosin could be plasticised by the addition of turpentine or other solvents. That the defendants infringed if the patent in suit is valid is on this record too clear to require argument. So the only issue made is whether plasticised rosin as a flux in tubular solder, or otherwise, was old and known to the art at the time of Ripley's alleged invention—a question not heretofore litigated.

Ripley's definition of the term "plastic" is necessarily wide. He uses it to distinguish his core from the "powder-like" nature of the rosin previously used. It requires that there be mixed with the rosin a sufficient amount of solvent such as turpentine, to form a substantially continuous and homogeneous plastic mass within the confines of the tube, not affected by the usual manufacturing and handling operations. His exhibits show a core sufficiently plastic to seal the open ends and prevent the ingress of air. The patent says this can be accomplished within a range of 2 per cent. to 50 per cent. of turpentine by weight, and there is evidence that it may go as high as 20 per cent. before the mixture would flow. In its product plaintiff uses 11 per cent. of turpentine. The patent states the obvious fact that a plastic core cannot fracture and "the ends of

the column effectively seal the entire tube." The rosin is, of course, the active fluxing agent. Ripley really confines his patent to a core consisting "merely of rosin mixed with a suitable percentage of turpentine or other plasticiser." And stated on cross-examination, that core solder is nothing more than a convenient form of soldering flux.

The patent does not in terms enjoin that the solder wire tube be completely filled with the plasticised mass, but does say that in order to facilitate its introduction, it is converted into a state of molten fluidity by the application of heat. Ripley seems to assume what defendants' expert testifies to, that the forcing of the plasticised material into a comparatively small tube will necessarily completely fill the tube. And furthermore he teaches that the core moves within the casing without fracturing its continuity, and at the same time seals the ends and prevents penetration by air. In fact, it is hard to conceive any other results in the absence of specific directions to the contrary.

As to the effect of air on a straight rosin pulverized core, the evidence is not satisfactory. Admittedly unconfined powdered rosin will oxidize. Ripley testified he had not made any direct measurements as to how far the so-called oxidation will penetrate into the end of the tube in any given period of time—a year for instance.

The record contains an offer of proof by the plaintiff, objection to which was sustained, but which, nevertheless, is in the record and discussed in his brief; to the effect that Mr. Ripley and Mr. Knight during a recess performed experiments to ascertain whether the powdered rosin core in the product produced and sold by the plaintiff would permit the passage of air. They found they could and did pass air and highly colored water through a four-foot length. In order to get the water through, one end of the rosin-cored solder of one-eighth inch size was immersed in the highly colored liquid and a vaccum of approximately 30″ was applied to the other end, and it took an hour and 30 minutes for the colored water to go through the four feet of the powdered rosin core in the solder. The method used to force the air through is not disclosed, but it is fair to assume that an equal amount of pressure would be required. Obviously the experiment throws no light upon what occurs under ordinary conditions.

Grosvenor, an expert, says that air in any substantial quantity could not penetrate minute, tightly-packed fragments of rosin confined in a small, narrow tube, and that the practical effect would be almost negligible and easily avoided, as only so much solder wire need be cut off as would be used in a short time, and the tube is easily sealed by pinching the end.

Exhibit R is a small lead tube filled with W. W. rosin. Exhibit S is a similar tube containing a mixture of 90 per cent. W. W. rosin and 10 per cent. turpentine. Both show good adherence to the walls and little, if any, difference in fracturing. So we conclude air will not penetrate straight rosin core to any appreciable distance at ordinary atmospheric pressure. Bearing in mind these observations on Ripley, the very limited character of the distinction upon which his patent must stand, namely, greater convenience of use, we proceed to the one issue made: Was plasticised rosin as a flux, in tubular solder or otherwise, old and known to the art at the time of Ripley's alleged invention?

Defendants' main reliance is the German patent to Zwietusch No. 397179, published June 14, 1924 (the earliest effective date of Ripley is September, 1925), "patented in Germany from February 10, 1922" (Defendants' Exhibit C), the translation of which (Defendants' Exhibit C–1) was satisfactorily established by the witnesses Holborn and Haas. Zwietusch states his object is a flux for the soldering of wires, preferably thin ones coated with lacquer; that heretofore an operation preliminary to the soldering was necessary in order to remove the coating of lacquer; that the object of the invention is to perform the soldering of the wire without first removing this coating, thus eliminating one operation and time and labor, and producing a much better soldering joint.

The patent then states what is material to this discussion; that it is expedient the agent that is mixed with the flux of the solder to dissolve the lacquer coating, or which replaces the flux hitherto used "be employed in the well-known form of the paste in tubular solder"; that turpentine, for example, may be admixed with the customary flux rosin in tubular solder as a solvent in proportions of 10 per cent. to 60 per cent. of the mixture.

Bearing in mind the rule that an American patent is not anticipated by a prior foreign one, unless the latter exhib-

its invention in such terms as will enable one skilled in the art to practice it without the necessity of making experiments, we turn to the record.

Dr. Frederick Holborn, a one-time student in several German Universities, holder of a doctor's degree, has had many years practical experience in laboratory and field work in soldering of all kinds of electrical wires, instruments, and apparatus, in which work he used many different forms of solder. He testified that this Zwietusch patent discloses a tubular solder and a flux of turpentine mixed with rosin. He describes it as a pasty flux in tubular solder, with a ratio 10 to 60 per cent. of turpentine, and that this German product can be used for soldering nonlacquer wire; that the descriptive word "röhrenlötzinn" used in the patent means tubular solder; that neither the compound word itself, nor any of its parts could be used to designate a collapsible tube.

George C. O. Haas, an expert translator of many years experience, testified that the Zwietusch translation (Exhibit C–1) was correct. He substantiated Holborn and pointed out that the word "röhrenlötzinn" is a compound word, "röhren" meaning pipe or tube. The element "löt" is the root of the verb "löten" to solder, and "zinn" means tin, "lötzinn" meaning soldering tin, and in practice refers to tin solder.

Among the dictionaries, Hoyer-Kreuter Technologisches Wörterbuch, erster band, 1932, Berlin, Deutsch-English-Französisch, Hoyer-Kreuter Technological Dictionary, First Volume, German-English-French, published in 1932 in Berlin, translates röhrenlötzinn as tube solder. Likewise Defendants' Exhibit E, "Vocabulaire Telephonique International," an international dictionary of telephonique published in seven languages, 1931, translates the word "röhrenlötzinn" as rosin cored solder. While the turpentine ranges of Ripley and Zwietusch differ in the extremes, they largely overlap, and as heretofore pointed out, the percentage of turpentine used by the Kester Company is within the figures mentioned in Zwietusch. Both describe a plastic composition that will necessarily fill and seal a solder tube.

Ripley testified that his product is used for so-called delicate operations, such as soldering in radio, fine electrical connections, and other similar work, so to some extent at least he covers the same field as Zwietusch, whose object is stated to be "the soldering of wires, preferably thin ones."

Compositions of matter, or any new and useful improvement thereof, constitute, of course, a recognized class of patentable subject-matter, provided they are not known or used in this country before the invention and not patented or described in printed publications in this or any foreign country before invention, etc. Tit. 35 U.S.C.A. § 31.

All Ripley claims is a new rosin composition as the tube core; turpentine and rosin mixed in such proportions as will render the composition plastic. That is to say, an improved form of rosin that is better adapted for use in a soldering tube than dry rosin. The method by which he arrives at his result is immaterial, and it makes no difference if the exact use he had in mind for his improvement had not theretofore been contemplated. Apparently he and Zwietusch had the same thought, to wit, a nonporous or plasticised rosin that could be confined in a soldering tube for more convenient use without drying out and pulverizing and which would, at the same time, fill and seal the tube. Both patents describe the same elements combined in the same way, and neither discloses a method for incorporating the plastic flux into the solder tube. And it may be observed in passing that Armor, No. 1531828, March 31, 1925, is the only one that does. He also antedates Ripley's idea of avoiding alleged "deterioration" of a flux by attempting to provide a method of tubular protection for his flux. After stating how he incloses the flux in his metal tube, he says: "Insuring that none of the same is lost or impaired through abrasion or oxidation." The conclusion cannot be avoided that Ripley and Zwietusch produce the same result, irrespective of the purpose for which they happen to be employed.

But granting for the moment that the Zwietusch tubular solder was not put to the same use as the Ripley product, nevertheless there is anticipation, if there was prior knowledge thereof accessible to the public, to invalidate a patent because of earlier invention. Furthermore, it is not necessary that the prior art should disclose appreciation of all the uses to which it can be put. It is enough to anticipate if the earlier device is susceptible of new use as it stands and without change. M.

& B. Mfg. Co. v. Munk (C.C.A.) 77 F.(2d) 261. And according to Tashjian v. Forderer Cornice Works (C.C.A.) 14 F.(2d) 414, at page 415, it is not material whether a prior patent ever went into actual use, or is more than a paper patent.

"Mere paper patents may negative otherwise patentable novelty, provided they sufficiently disclose the principles of the alleged invention, or provided the alleged objections can be obviated by mere mechanical skill." Citing General Electric Co. v. Philadelphia Electric & M. Co. (D. C.) 226 F. 488, affirmed in (C.C.A.) 232 F. 722. See, also, Pickering v. McCullough, 104 U.S. 310, at page 319, 26 L.Ed. 749.

Walker, in his work on patents (6th Ed.) vol. 1, § 96, says that a prior patent or publication need not to have been reduced to practice, or to be more than a paper proposition, in order to negative the novelty of a later patent, even though the devices of the prior patents be incapable of successful operation. That it is sufficient if the prior patent embodies the elements and discloses the principle of operation of the patent in suit. Citing Ideal Stopper Co. v. Crown Cork & Seal Co. (C.C.A.) 131 F. 244, and Westinghouse Air B. Co. v. Christensen Engineering Co. (C.C.A.) 128 F. 437.

This record is replete with trade publications, catalogues, etc., of general trade circulation in Germany and elsewhere in Europe, describing soldering, tubular solder with paste cores, rosin cores, etc. To cite two examples only. "Soldering and Welding, Handbook for Practical Men by Edmund Schlosser, Fifth Revised Edition, Vienna and Leipzig, 1922," devotes a chapter to soldering fluxes, commercially obtainable, that remove oxide and dirt, and are obtainable in the form of soldering sticks, soldering paste, soldering tin in collapsible tubes, and as tubes made of solder filled with soldering paste.

Wilhelm Carstens, Electro-chemische Fabrik, Hamburg 39, Catalogue No. 58, published in English and German, dated November 15, 1921, describes and pictures "Econ-röhrenlötzinn mit pasta einlage" (English copy), tube soldering tin with paste core, and also a solder wire as "tube soldering tin with colophony core."

■ Imperial Glass Co. v. A. H. Heisey & Co. (C.C.A.) 294 F. 267, cited with approval in Jockmus v. Leviton (C.C.A.) 28 F.(2d) 812, and Cooper v. Robertson (D. C.) 38 F.(2d) 852, holds that printed manufacturers' catalogues circulated among the trade and containing illustrations of designs are "printed publications" within the meaning of the patent statute.

It is urged that a more strict rule applies to foreign patents and some courts have so held. Seymour v. Osborne, 11 Wall. 516, 20 L.Ed. 33; Hanifen v. E. H. Godshalk Co. (C.C.A.) 84 F. 649; In re Ek, 57 App.D.C. 203, 19 F.(2d) 677. Judicial legislation is as a rule unjustified, especially where, as here, the statute (tit. 35, U.S.C.A. § 31) is so clear and unambiguous as to the requirements of a valid patent. We agree with Judge Swan's remarks found in Trussell Mfg. Co. v. Wilson-Jones Co. (C.C.A.) 50 F.(2d) 1027, at page 1029.

■ True Ripley has attained some commercial success, but this can only be considered in doubtful cases. In McClain v. Ortmayer, 141 U.S. 419, at page 426, 12 S. Ct. 76, 79, 35 L.Ed. 800, the court said: "That the extent to which a patented device has gone into use is an unsafe criterion, even of its actual utility, is evident from the fact that the general introduction of manufactured articles is as often effected by extensive and judicious advertising, activity in putting the goods upon the market * * * as by the intrinsic merit of the articles themselves."

And in the very late, if not the latest discussion of patent law by the Supreme Court, Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S. Ct. 449, 79 L.Ed. 997, the Supreme Court disapproved of the finding of the Court of Appeals that voluminous evidence showing the practical utility and widespread use of the patented process was sufficient to establish invention.

■ This discussion leads us to the conclusion that the Ripley patent No. 1724680 is invalid, because each of the claims thereof is anticipated by the Zwietusch German patent, No. 397179, and unpatentable over descriptions in printed publications, all before his invention or discovery.

Findings of fact and conclusions of law are filed herewith and a decree dismissing the bill may be submitted by counsel for the defendants.