## ÆOLIAN–SKINNER ORGAN CO., Inc., v. SHEPARD BROADCASTING SERVICE, Inc., et al.
### No. 3034.

Circuit Court of Appeals, First Circuit.
Jan. 10, 1936.

Rehearing Denied Feb. 14, 1936.

Robert Cushman, of Boston, Mass. (Clarence S. Walker, Robert L. Thompson, and Roberts, Cushman & Woodberry, all of Boston, Mass., on the brief), for appellant.

Howard W. Cole and Arthur D. Thomson, both of Boston, Mass. (Brickley, Sears & Cole, of Boston, Mass., on the brief), for appellees.

Before MORTON, Circuit Judge, and MORRIS and SWEENEY, District Judges.

MORTON, Circuit Judge.

This is an appeal by the plaintiff in a patent suit from a decree which held patent to Marks for method and apparatus for broadcasting dated August 24, 1926, No. 1,596,984, valid but not infringed.

In radio broadcasting, the original performance of the words or music is converted at the microphone into electrical waves or currents; these waves or currents are converted by the broadcasting apparatus into radio waves or currents and sent out over the air; and these in turn are picked up by receiving sets and reconverted into sound. It is of course highly desirable that the sound at the receiving set shall be, as near as possible, that of the original performance. A great deal of study and effort have been devoted to obtain this result.

It was recognized before Marks entered the field that the performance which was being broadcast ought to be listened to as it went out over the air by a receiver at the transmitting station, in order to adjust the original rendition of the words or music and the transmitting apparatus to give the best possible reception. Arrangements to do this were well known; it was called "monitoring" the broadcast. The monitor might be remote from the performance itself, listening to it over his radio receiving set and advising the performer and adjusting the transmitting apparatus without hearing the original words or music, or he might be stationed where he could hear them. It may be observed, although nothing turns on it, that the monitor's listening in set was sometimes connected to the transmitting apparatus before the electrical currents had been converted into radio currents or waves, and sometimes it was operated from a loop or antenna like ordinary receiving sets.

Whether the monitoring was done within sound of the original performance or remote from it, difficulties were involved. If done in the former way, the two renditions (i. e., the original and the reproduced) coming to the monitor at the time were confusing; while, if the monitor did not hear the original performance, he was not as well able to criticize and control the reproduction of it. This difficulty appears to have been especially noticeable in broadcasts of organ music.

In this situation Marks took the steps described in his patent. It was conceived in relation to organ music, and can most clearly be discussed and understood on that footing, although the patent is not so restricted. Marks' basic idea was that the performer of the music should be isolated from all sound of the organ itself, and, while he was playing, should hear only the reproduction of the music as it came to him over the monitor receiving set, and should do his own monitoring. Marks located within reach of the performer certain monitor controls of the broadcasting apparatus. The performer hearing the broadcast of his performance was able, it is said, so to control his playing and so to adjust the transmitting apparatus as to send to the public receiving sets much better music. Marks insulated his performer from the sound of the organ in either of two ways. In the first, the performer wore a soundproof helmet—which had been developed for use in aeroplanes—with earphones connected with the monitor receiving set; in the second, the console of the organ was placed in a soundproof room or cabinet in which were located the monitor receiving set and the controls of the broadcasting apparatus, and into which the music of the organ itself did not penetrate to any disturbing extent. The defendant does not use the helmet, and that phase of the patent need not be further considered.

The Marks patent is on a method and apparatus. Its language is rather pompous and exaggerated, but it states the invention as above described. It shows that Marks had in mind the sound of the performance at the ultimate receiving sets, and was thinking of the performance on

the organ, its electrical and radio transmission, and its final reproduction, as a unitary combination which brought to the hearer the performer's interpretation of the music. He even goes so far as to suggest the preparation, as the result of preliminary tests, "of a revised score for the primary rendition (i. e., the original performance) which when followed by the performer will develop in the secondary rendition (at the receiving set) the interpretation desired." Page 1, line 52 et seq. His method "consists in the faithful development of the interpretation of the performer * * * through the manipulation of expression, quality, etc., at the producing, transmitting or broadcasting stations or any or all of them, synchronously with the primary rendition by the performer * * * and irrespective of the interpretation of the primary rendition." Page 1, lines 21–30. He further says: "These controls (of the organ manual) and the controls of the detecting, transmitting, and broadcasting apparatuses are associated together for manipulation by the performer alone or by one or more performers in duet or by a performer and some other person." Page 1, lines 96 to 100. "Lastly there is a rewritten score setting forth that revised primary rendition and its electrical modifications which when broadcast will produce a. secondary rendition faithful to the interpretation of the performer." Page 2, lines 1–6.

Marks' conception thus is of a performer at the organ isolated from all sound of his playing except that coming to him through the monitor receiving set, and adapting his performance on the .organ and using his control of the transmitting apparatus, so that the sound which comes to him over the monitor set shall be true to his interpretation of the music which he is playing. It was a conception of some breadth, and it appears to have been new.

The second claim, which is typical of the first three, reads as follows:

"2. The method of broadcasting which consists in effecting a primary rendition to be broadcast, synchronously translating the energies thereof through the broadcasting train into a secondary rendition, also substantially synchronously with the primary rendition varying the energies of the broadcasting train to produce primarily a perfect secondary rendition, the while preventing the energies of the primary rendition from reaching the renderer, and communicating to him the secondary rendition exclusively."

As to infringement of this claim, the question is what is covered by the element, "also substantially synchronously with the primary rendition varying the energies of the broadcasting train to produce primarily a perfect secondary rendition." Lines 41 to 45. The plaintiff contends that this means nothing more than adjusting the performance on the organ to the ultimate reception. The District Judge in a careful opinion concluded that it brought in control of the broadcasting apparatus. We think he was clearly right for the reasons which he gave, and which it is unnecessary to restate. The first three claims were not infringed.

The fourth claim reads as follows:

"4. A broadcasting apparatus comprising a primary sound producing instrumentality, control means for the same, a secondary sound producing instrumentality co-ordinated with the primary one, and means to communicate the secondary sounds to an operator of the control means to the exclusion of the primary sounds."

The four elements composing this claim are: (1) The organ; (2) the console; (3) the monitor receiver; and (4) the soundproof room in which the console is located. The same elements somewhat differently described are grouped in the fifth and eighth claims. These three claims may be discussed together. The District Judge held that they were not infringed, because he thought that the monitor receiver which is described in the claim as "coordinated with the primary one" was .meant to cover a receiver in the console room equipped with electrical devices regulating the broadcast under the control of the performer. He also held that this claim was not infringed because the defendants' console room was not absolutely soundproof. It appeared in evidence that, when the defendants' organ was played loudly, the sound of it penetrated to some extent into the console room, and also that the door of the console room was often left open during performances. He was of opinion that Marks was restricted by the proceedings in the Patent Office to a console room which was absolutely soundproof while the performance was going on.

As to the meaning of "coordinated": The word is used in the claim with ref-

erence to "a sound producing instrumentality"; in other words, a receiving set. It obviously means that the receiving set shall be tuned in on the broadcast which is being sent out. The claim contains no suggestion of control of the electrical apparatus—the "control means" referred to in it relate solely to the organ. Taking the claim in its simple and obvious meaning, it covers one phase of Marks' invention as described in the specifications. The word "coordinated" means "adjusted to," "in harmony with," etc. To extend its meaning so as to make "the secondary producing instrumentality *coordinated* with the primary one," not merely a receiving set, but also an apparatus for the electric control of the broadcasting apparatus, seems to us unwarranted.

With regard to the other point relied on by the District Judge, the applicant's patent solicitor in a communication to the Patent Office referred · to a headpiece "which *absolutely* shuts out extraneous sounds" and "a heavy cabinet with *absolutely* sound-proof walls by means of which the same thing can be effected." And that, "without such operatively effective apparatus for the purpose, the primary sounds are bound to reach the ear of the performer and to mar the secondary rendition which he hears. A marred secondary rendition is an untruthful one and the performer is, therefore, not only prevented from manipulating the primary rendition in synchronism, but prevented from so manipulating it that secondary rendition anywhere near perfection can be had." The solicitor then pointed out that the *monitor receiver* must be remote from or isolated from the *transmitting* microphone, or else sounds coming from the monitor would mix with the broadcast and injure the performance.

■ The District Judge was of opinion that this language estopped Marks from claiming that his patent covered a console room which was not absolutely sound-proof. There is no suggestion in the prior art, so far as patents are concerned, of a soundproof console room. There was oral testimony from several witnesses that one had been used before the date of Marks' invention; but this testimony was in parts contradicted by other witnesses and was entirely unsupported by contemporaneous documentary evidence. The District Judge found that anticipation of an insulated console room had not been established. It can by no means be said that his finding was clearly wrong.

The question therefore is whether the language used in argument by the solicitor operates to cut down the scope of Marks' invention. It was used, not to distinguish the Marks' console room from other console rooms, but to emphasize the nature of the forward step which he claimed to have taken, and to distinguish the use of ordinary telephone headsets, covering both ears and connected with the monitor set (which by no means excluded the sound of the primary performance and did not do so well enough to be effective), from the applicant's helmet or insulated room. Moreover, there was testimony—and it is probably a matter of common knowledge—that in a city there is no such thing as an "absolutely" soundproof room, at least, not in any practical way.

Marks' idea was, as has been said, that the console and the monitor loud-speaker should be placed in a room so insulated against sound that no other sounds or noise could enter it which, as a practical matter, would confuse the sounds coming through the monitor loud-speaker to which the performance was being adjusted. We do not think that the language used, arguendo, by his patent solicitor estopped him from insisting on this construction of the claim.

■ It is hardly contended that this conception did not involve invention. "In every case the idea conceived is the invention." Brown, J. Gill v. United States, 160 U.S. 426, at page 434, 16 S.Ct. 322, 325, 40 L.Ed. 480. "Patentability has often been found 'in discovering what is the difficulty with an existing structure' and correcting the same, even though 'the means' are old and their mere 'adaptation to the new purposes involves no patentable novelty.'" Kurtz v. Belle Hat Lining Co. (C.C.A.) 280 F. 277, at page 282. See, too, Eibel Process Co. v. Paper Co., 261 U.S. 45, at pages 67 and 68, 43 S.Ct. 322, 67 L.Ed. 523. In our opinion, claims 4, 5, and 8 are valid and have the scope which has been indicated.

The defendant constructed an insulated room in accordance with the description in the Marks patent in order to avoid the difficulties in its organ broadcasting which Marks refers to; and it uses the room for that purpose. There is no doubt that it infringes claims 4, 5, and 8 as we

have construed them. Border line constructions of console rooms or locations of the console are easily conceivable, but the case before us does not present that difficulty.

The decree below must be vacated and the case remanded to that court for further proceedings in accordance with this opinion.

The decree of the District Court is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion; the appellant recovers costs of appeal.