**Application of George H. SCHIPPEREIT.**
**Patent Appeal No. 7240.**

United States Court of Customs
and Patent Appeals.
March 18, 1965.

Martin, J., and Worley, C. J., dissented.

J. Helen Slough, Cleveland, Ohio, for appellant.

Clarence W. Moore, Washington, D. C. (Jere W. Sears, Washington, D. C., of

counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

Claims 8, 10, 16 and 19 of appellant's patent application [1] were rejected by the examiner as "unpatentable over" the prior art, which rejection, in the context of this case, is one for obviousness under 35 U.S.C. § 103. The Board of Appeals sustained the rejection on this basis and appellant has appealed.

Since section 103 calls for an analysis of the "differences between the subject matter sought to be patented and the prior art," we shall first consider what was taught by the references of record, and then consider the differences thereover as defined by the appealed claims.

The references relied upon by the Patent Office are:

| Northrup | 1,286,395 | Dec. 3, 1918 |
| Clamer | 1,940,622 | Dec. 19, 1933 |
| Rossi (French) | 1,064,849 | May 18, 1954 |

Northrup is concerned with the problem of melting and stirring metal by induction methods. When alternating current is caused to flow in a coil surrounding a crucible, corresponding currents are induced in the metal contained within the crucible. These currents circulate within the metal and give rise to heat. When the metal is molten, there is also a stirring effect.

Northrup indicates that the crucible itself may be made either of electrically conducting or non-conducting material. If the crucible material is non-conducting, all of the induced currents will be within the metal charge, and the heating will be direct. If, however, the crucible is of conducting material, most of the current will be induced within the crucible walls, thus heating the walls and only indirectly heating the metal charge by conduction of heat from the walls. Also, very little stirring will occur where the induced current is largely within the crucible walls.

Northrup uses a spark-gap oscillator to provide the primary alternating current to the coil surrounding the crucible. The frequency employed is not specified, but he discloses that the frequency depends upon the physical characteristics of the circuit components in the oscillator.[2]

The Clamer patent is primarily directed to the problem of stirring or mixing molten metal in a crucible for the purpose of adding, treating or alloying materials into the molten charge. Clamer makes use of the fact that currents induced in the molten metal cause agitation as well as heating. As stated in the patent:

"It is my intention to use induced electric current from a supply within the lower range of frequencies rather

---

1. Serial No. 660,287, filed May 20, 1957 for "Induction Furnace."

2. The board notes in its discussion of the examiner's rejection that " * * * reference is made to the Northrup patent for its disclosure of the use of commercial [60 cps] frequency, induction heating to melt metal in a furnace." We think this is an erroneous reading of Northrup by both the examiner and the board.

At one point Northrup makes the statement that "Commercial charging frequencies can be used and the furnace is capable of highly advantageous use on polyphase circuits * * *." At an earlier point, however, the patentee states: "The purpose of my invention is to utilize the heating effect of electric currents having the natural frequency of a freely oscillating electric system from a condenser discharging through a gap as contrasted with the forced frequency directly produced by alternators."

From this we think it is clear that Northrup meant only that his *oscillator* circuit could be powered with commercial requency current. The frequency of the current delivered *by* the oscillator to the coil surrounding the crucible depended upon the circuit elements in the oscillator. We note that the solicitor apparently agrees with this position, for his brief states: "While a commercial frequency might be used to charge oscillator condenser $C^1$, 'it is indifferent within wide limits what may be the natural frequency of the oscillatory circuit.' "

than of high frequency. Most desirably I use commercial frequency.

"As an additional or alternate step I may employ high frequency where heating is preferable to stirring. I may also heat while I stir.

\* \* \* \* \* \*

"As my invention relates to a treating operation rather than a heating operation, I have assumed that the charge would be melted elsewhere, in any suitable furnace not shown, although it would of course be possible, as indicated above, but often not desirable, to melt in the treating furnace.

\* \* \* \* \* \*

"The heating effect upon a charge [of metal] within an inductor coil carrying alternating current is dependent upon and is very nearly proportional to the frequency as well as to the square of the ampere turns, but the stirring effect upon the charge of the alternating current passing through an inductor is largely independent of the frequency and is dependent upon the square of the ampere turns. Therefore, at low frequency, I may obtain stirring with relatively little heating effect, while at high frequency I would obtain the same stirring with considerable heating effect.

"As I wish usually to obtain stirring without great heating effect I will normally maintain the ampere turns at a minimum, as well as use low frequency."

These statements seem clearly to teach that, if any significant heating is wanted, "high" frequencies must be employed.

Clamer's crucible is apparently made of electrically nonconductive material, for if the crucible were conductive, the currents would be largely induced within the walls of the crucible itself, and there would be little or no stirring.

Rossi discloses a cylindrical mold for the continuous casting of metals. Molten metal is introduced into the mold at the top through a nozzle and a solid ingot is continuously withdrawn from the mold at the bottom. As the molten metal cools, a cone shaped crater is formed axially of the molten mass. One of Rossi's problems was to reduce the size of this crater so that the casting operation could be performed more rapidly. His solution was to position induction coils around the mold such that the resulting induced currents in the molten mass would produce a stirring action tending to minimize the depth of the crater.

Rossi's mold is made of conductive material. Therefore, in order to prevent the currents being induced in the walls of the mold, the mold is made in segments, each segment being electrically insulated from the others. Thus, most of the currents are induced in the molten metal so that they are able to produce the desired stirring action.

No mention is made by Rossi either of heating the molten metal or of operative frequencies. He does, however, disclose cooling of the mold by circulating cooling fluid through conduits in the mold segments.

Appellant's claimed invention is similar to all of these references, but only in certain general aspects. It differs in other respects from each of them. The issue we are required to determine is whether the board was correct in holding that these differences are such that appellant's claimed subject matter as a whole would have been obvious to one of ordinary skill in appellant's art at the time the invention was made.

Appealed claims 8 and 19 are illustrative of what appellant asserts to be his invention and read as follows:

"8. A low-frequency coreless induction furnace comprising a cup-shaped metal crucible having an inner metal surface formed from a hollow, cylindrically shaped metal part and a disk shaped metal bottom, said cylindrically shaped part being

formed of individual metal sections, each of said metal sections constituting a continuous area running the length of said part and said sections being insulated from one another by an electrically nonconductive material, said cylindrically shaped part being insulated from said disk-shaped bottom by an electrically nonconductive material, means surrounding said crucible for providing an induced low-frequency alternating current to the charge contained within and in contact with the inner metal surface of said crucible and means for cooling the outside surface of said crucible.

"19. The method of induction melting of metals comprising introducing and confining said metal within a crucible chamber formed at least by a cylindrical metal wall which provides a metal crucible chamber surface, the cylindrical metal wall being formed with at least one slit running substantially longitudinally the length thereof and filled with an electrically nonconductive material; cooling the outside surface of said crucible wall; subjecting the introduced metal confined within the cooled crucible chamber to a low-frequency alternating current melting flux induced from a primary induction coil surrounding said metal crucible wall; interrupting any circumferential current flow induced by said coil in said metal crucible wall to prevent induction heating of said metal crucible wall; and melting said introduced metal confined in said crucible chamber by said current without wetting or alloying between the crucible chamber surface of said cooled crucible and the introduced metal; thereby avoiding contamination of the introduced metal and damage to the crucible."

As indicated in claim 8, appellant has invented an induction furnace in which the crucible is divided into segments, which segments are electrically insulated from one another and from the bottom. The primary current in the induction coil is defined as "low-frequency," by which appellant means, as expressly stated in his specification, "the frequency range below about 1000 cycles per second."

Appellant asserts many advantages for his invention. The fact that the insulated, segmental crucible design makes possible the use of metallic, electrically conductive materials is important, since refractory, non-conductive crucible materials have a tendency to contaminate the melt. Also, the fact that no heat is generated in the crucible walls by induced currents, coupled with the use of crucible cooling means, permits the employment of metal crucible materials having a lower melting temperature than the metal to be melted, without the problems of alloying or "wetting."

Another important feature asserted by appellant is that low frequency operation minimizes the problems of "skin effect." As frequency increases, the induced currents tend to concentrate nearer and nearer to the surfaces or "skin" of the metal charge in the crucible. Such localization of induced currents causes uneven heating and stirring, with most of the activity occurring very near to the surfaces of the metal charge. Operation within appellant's claimed frequency range substantially eliminates this undesirable effect.

The references of record do not teach or suggest to one skilled in the art that low frequencies are suitable for induction melting of metals. As pointed out in note 2, supra, the examiner went to some lengths to show, and we think erroneously, that Northrup teaches the use of commercial frequency for such an application. Also, we think the Clamer reference teaches *away* from the use of low frequency for melting. Nevertheless, appellant recognizes that there was a knowledge of particular types of low frequency furnaces prior to the time he made his

invention, for as his specification states, "A disadvantage of high-frequency induction furnaces and *prior known low-frequency coreless furnaces* is the contaminating effect of the crucible on the molten metal." [Emphasis added.]

Notwithstanding the fact that each of the individual features of appellant's invention was known to the prior art, however, we feel the board was wrong in holding the invention to have been obvious. The board's conclusion amounts to a finding that it would have been obvious to select and combine ideas from the several references. But we think both the selection and combination were unobvious when tested without the benefit of appellant's disclosure. The critical problem with which appellant was concerned was contamination of the molten metal within the prior art furnaces. As pointed out above, the prior use of non-conductive ceramic or other refractory crucible materials resulted in contamination of the molten metal, while the use of metallic crucibles· produced undesirable alloying which also contaminated the molten charge. Appellant has solved this problem by what is clearly a novel and, we hold, an unobvious combination of various features selected from the prior art, viz.: 1) the use of a metallic crucible to obviate the type of contamination resulting from the use of ceramics or other non-conductive refractories; and 2) further preventing contamination, due to alloying of the molten charge with the metallic crucible material, in three distinct ways: a) by using cooling means to remove heat from the crucible; b) by employing segmented, insulated construction of the crucible to prevent induction of currents and thus generation of heat in the crucible itself; and c) by employing a low frequency range which eliminates skin effect and thus prevents excessive heating at the surfaces of the molten metal, where alloying would normally occur.

Upon considering appellant's invention as a whole, including not only the structural features and process steps, but also the nature of the technical problems involved as well, see Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923), we find that what appellant claims as his invention would not have been obvious to one of ordinary skill in the induction furnace art at the time the invention was made. Neither singly nor in combination do the references make obvious the many-faceted solution to the problem worked out by appellant and here claimed as his invention, both in terms of the furnace construction and in terms of a method.

The appealed decision is accordingly reversed.

Reversed.

MARTIN, Judge, dissenting, with whom WORLEY, Chief Judge, joins.

Clamer specifies that "the heating effect upon a charge within an inductor coil carrying alternating current is dependent upon and is very nearly proportional to the frequency as well as the square of the ampere turns.[1]" The reference specifically suggests heating, as is apparent from the following passages:

"Thus, it will be seen that I may choose between the use of stirring with or stirring without appreciable heating effect. If I desire the heating effect for a given number of ampere turns, the frequency should be increased, otherwise I will employ low, preferably commercial frequency.

" * * * unless I desire to heat the charge during treating, I will use relatively low amperage and low frequency."

Clamer also specifies that "[m]elting of the charge preliminary to its treatment may be effected * * * by the induction furnace in which it is to be treated."

1. Ampere turns are the product of the number of turns in the coil and the number of amperes of current therethrough.

Clamer thus teaches that the amount of heating will increase proportionally with increase in frequency from his "low, preferably commercial frequency" to some higher frequency which he uses if he intentionally heats the charge. Moreover, Clamer teaches that the ampere turns, as well as the frequency, are kept at a minimum to hold down heating effect.[2] I think that teaching, along with the statement quoted above that heating effect increases with increase in ampere turns, suggests to a person skilled in the art that a heating effect sufficient to melt a metal charge could be obtained at a particular "low" frequency[3] by increasing the current without further increasing the frequency.

Appellant himself establishes that those relationships taught by Clamer were in fact followed in prior art induction furnace design by using high currents at low frequencies as an alternative to lower currents at high frequencies. Thus, appellant's application states:

"Coil currents somewhat higher than used *in prior known induction melting practices* are required to overcome heat loss because of the low temperature of the crucible wall. *In prior practice coil currents of the order of 6000–7000 amperes at 60 cycles per second, and of 300–500 amperes at 2000 cycles per second are usual.* * * *" [Emphasis supplied.]

Appellant makes other references in his application to low frequency induction furnaces as known prior to his invention, referring, for example, to "prior known low-frequency coreless [induction] furnaces."

Thus the issue seems to be whether constructing the crucible of Clamer of electrically insulated, water cooled, metal sections, for use in melting metals at frequencies known in the prior art, would be obvious. In my opinion, Rossi's disclosure of insulated mold sections for the purpose of avoiding induction currents in the casing and of water cooling the sections would clearly suggest use of a corresponding construction in Clamer. It would also seem obvious to cool the crucible to a low enough temperature to prevent alloying of the crucible material with the melt. Such water cooling also would obviously cool the outside of the crucible.

A bottom member for the crucible is required only by claims 8 and 9. Where one was making a crucible of insulated conductive segments in line with Rossi's teachings, it would seem but an obvious expedient to make the bottom in the form of a separate insulated disk-shaped member.

For the foregoing reasons, I would affirm the decision of the Board of Appeals.

---

2. Thus the patent states:
   "As I wish usually to obtain stirring without great heating effect I will normally maintain the ampere turns at a minimum, as well as use low frequency."

3. The Clamer patent, issued in 1933, does not specify the number of cycles considered "low, preferably commercial" frequency or "high" frequency. Appellant, in his application, refers to ordinary commercial power frequency as usually 60 cycles per second in the United States, and defines "low" frequency as the frequency range "below about 1000 cycles per second."